1

2

3

4

5

6

7

8                  IN THE UNITED STATES DISTRICT COURT

9                FOR THE EASTERN DISTRICT OF CALIFORNIA

10   UNITED STATES OF AMERICA,

11              Plaintiff/Respondent,          No. CR S-96-00088 GEB DAD P

12        vs.

13   CALS IFENATUORA[1],

14              Defendant/Movant          <u>FINDINGS AND RECOMMENDATIONS</u>

15   _____/

16              Movant is a federal detainee in the custody of Immigrations and Customs

17   Enforcement (ICE) being held at the Irwin County Detention Center in Ocilla, Georgia.  His

18   motion for writ of error coram nobis, in which he seeks to set aside his guilty plea which he

19   entered in this case back in 1996, is currently before the court.  Movant claims that he received

20   ineffective assistance of counsel in violation of the Sixth Amendment.  The United States ("the

21   Government") has answered the motion, and movant has filed a traverse.

22   /////

23   _____

24        [1]  Movant's name is spelled "Ifenatuorah" on the court's docket.  However, movant's
     orginal motion for writ of coram nobis reflects the spelling of his name as "Ifenatuora."  (Doc.
     No. 90.)  The government acknowledged movant's use of this different spelling in its answer to
25   the motion.  (Doc. No. 119 at 6, n.1.)  Without making any finding as to the correct spelling, the
     undersigned has used in these findings and recommendations the spelling used by movant in his
26   pending motion for relief.

I.   Procedural Background

At all times relevant to his motion for writ of error coram nobis, Movant Ifenatuora has asserted that he is a citizen of Nigeria.  When he was charged with and pled guilty to the underlying criminal charges, he was a legal resident of the United States.

On February 6, 1996, the Government filed a two-count criminal complaint against Movant Ifenatuora, alleging that he had engaged in the unauthorized use of an access device (i.e, a credit card), in violation of 18 U.S.C. § 1029(a)(2)-(b)(1), and that he had been in possession of five or more false identifications, in violation of 18 U.S.C. § 1028(a)(3).  (Doc. No. 1.)  Counsel was appointed to represent Mr. Ifenatuora at his initial appearance in the criminal proceedings, and the court scheduled a preliminary hearing for March 7, 1996.  (Doc. No. 2.)  On March 1, 1996, a federal grand jury in the Eastern District of California indicted movant.  (Doc. No. 5).  On March 11, 1996, he was arraigned on the indictment.  (Doc. No. 8.)

On September 6, 1996, Mr. Ifenatuora, acting through counsel, entered into a plea agreement to resolve his criminal case.  (Doc. No. 20.)  That same day, and pursuant to the plea agreement, Mr. Ifenatuora withdrew his plea of not guilty and entered a new plea of guilty to one count of the unauthorized use of an access device and one count of the possession of five or more false identifications.  (Doc. No. 18.)  On January 17, 1997, he was sentenced to concurrent 37-month terms of imprisonment in the custody of the U.S. Bureau of Prisons on each count of conviction and ordered to pay $107,574.01 in restitution.  (Doc. Nos. 25-26.)

Mr. Ifenatuora filed an appeal from his judgment of conviction and sentencing in the Ninth Circuit Court of Appeals on February 11, 1997.  (Doc. No. 29.)  On January 13, 1998, that court affirmed the judgment of conviction but remanded the matter to this court for the following corrections in the judgment:  (1) dismissal of the unlawful possession of five or more false identifications count because the indictment failed to include allegations addressing the element of federal jurisdiction; (2) a resulting reduction in the term of supervised release; and (3) a resulting reduction in the amount of restitution from $107,574.01 to $15,846.31 to reflect only

2

1    the loss suffered by the victim of the sole remaining count of conviction.  (Doc. No. 45.)  On July

2    13, 1998, the parties signed a Stipulation of Parties Concerning Dismissal of Charge and Re-

3    Sentencing After Remand.  (Doc. No. 48.)  On February 21, 1998, the assigned district judge re-

4    sentenced movant in accordance with the Ninth Circuit's decision on appeal.  (Doc. No. 49.)

5           On August 28, 1998, Mr. Ifenatuora filed a motion on his own behalf, asking this

6    court to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255.  (Doc. No. 53.)  On

7    July 7, 1999, the undersigned recommended that the § 2255 motion be denied.  (Doc. No. 65.)

8    The assigned district judge adopted those findings and recommendations in full on August 16,

9    1999 and denied the § 2255 motion.  (Doc. No. 66.)

10          On November 8, 2010, Mr. Ifenatuora filed the motion for writ of error coram

11   nobis that is now pending before the court.[2]  (Doc. No. 103.)  Movant was appointed counsel in

12   connection with the pending motion on November 15, 2010.  (Doc. No. 106).

13       II.   The Underlying Proceedings

14          On April 17, 1996, then Federal Defender Arthur W. Ruthenbeck, representing

15   Mr. Ifenatuora, sent then Assistant U.S. Attorney Johnny L. Griffin, III, a letter regarding the plea

16   negotiations between the parties.  Therein Federal Defender Ruthenbeck requested that

17           [i]n the event deportation proceedings are instituted against Mr.
             Infenatuora, he also would like a favorable letter from you and the
18           case agent to the INS administrative law judge which describes his
             cooperation and, based on his cooperation, recommends against his
19           deportation.[3]

20   /////

21

22      [2]  Mr. Ifenatuora first filed his motion for writ of error coram nobis on April 26, 2010.
     (Doc. No. 90.)  The matter is proceeding on the most recently filed motion.  (See Doc. No. 106.)

23

24      [3]  This suggested provision whereby the government would agree to provide a
     recommendation against deportation is such proceedings were instituted, appears nowhere in the
     Memorandum of Plea Agreement eventually entered into by the parties and filed with the
25   court on September 6, 1996.  (Doc. No. 20.)  That plea agreement did contain the standard
     provisions that the written agreement constituted the entire plea agreement and that no other
26   promises or inducements were made to the defendant.  (Id. at 4-5.)

3

(Answer, Ex. A (Doc. No. 119-1) at 8.)[4]  Mr. Ifenatuora was copied with his counsel's letter to the prosecutor.

When Mr. Infenatuora pled guilty on September 6, 1996, there was no mention of his immigration status or of deportation as a possible consequence of his plea at the change-of-plea hearing.  (Answer, Ex. 3 (Doc. No. 119-1).)  At the time, legal permanent resident aliens were subject to possible deportation if they had been convicted of an aggravated felony, convicted of certain controlled substance offenses, certain firearm offenses, certain miscellaneous crimes, or for crimes of moral turpitude.  In this regard, the controlling statute, 8 U.S.C. § 1251(2) (West 1996), then stated:

> Any alien who–
>
>> (I) is convicted of a crime involving moral turpitude committed within five years (or 10 years in the case of an alien provided lawful permanent resident status under section 1255(i) of this title) after the date of entry, and
>>
>> (II) is convicted of a crime for which a sentence of one year or longer may be imposed,
>
>> is deportable.
>
> (ii) Multiple criminal convictions
>
> Any alien who at any time after entry is convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct, regardless of whether confined therefor and regardless of whether the convictions were in a single trial, is deportable.
>
> (iii) Aggravated felony
>
> Any alien who is convicted of an aggravated felony at any time after entry is deportable.

---

[4]  The court uses the page numbers assigned by the court's CM/ECF system, where applicable.  However, transcript citations are to the pages listed on the original transcript.  Also, where technical errors obscure the page number assigned by CM/ECF, the court has used the page number recorded on the original document, if available.  (See e.g., Doc. No. 119-4 (presentence report).)

An aggravated felony was defined, in relevant part, as an offense involving fraud or deceit in which the loss to the victim exceeded $200,000.  8 U.S.C. § 1101(43)(M)(I) (West 1996).  Mr. Ifenatuora did not admit to an aggravated felony as part of his plea, since the loss to his victims in the underlying case did not exceed $200,000.[5]  He did, however, admit to two counts reciting crimes of moral turpitude, insofar as each count of the indictment charged him with committing an act of fraud.  See Jordan v. De George, 341 U.S. 223, 227 (1951) (concluding in a deportation case that "fraud has consistently been regarded as such a contaminating component in any crime that American courts have, without exception, included such crimes within the scope of moral turpitude").

Twenty-four days after the District Court accepted Mr. Ifenatuora's plea in this case, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009 (Sept. 30, 1996), was enacted.  IIRIRA lowered the threshold amount of loss to the victim for fraud offenses to qualify as aggravated felony convictions from $200,000 to those involving a loss that exceeded $10,000.  8 U.S.C. § 1101(43) (M)(i) (West 1997).

On December 11, 1996, the United States Probation office completed its presentence investigation report on Mr. Ifenatuora.  (Answer, Ex. 2 (Doc. No. 119-4).)[6]  It is undisputed that the presentence report included in its recommendation the condition that, pursuant to 18 U.S.C. § 3583(d)(3), upon completion of the term of imprisonment imposed the defendant be immediately surrendered to immigration officials for deportation in accordance with the established procedures provided by the Immigration and Naturalization Act and that if ordered deported during the term of supervised release, the defendant be ordered to remain

---

[5]  As noted above, the Ninth Circuit later reduced the amount of restitution ordered as part of movant's sentence based on loss to the victim in connection with the sole remaining count of conviction to $15,846.31.

[6]  This document was filed with the court in its entirety under seal in connection with these collateral proceedings.

1  outside the United States and not reenter the United States without consent of the Attorney

2  General of the United States.  (Id. at 18-19.)

3              On January 17, 1997, Mr. Infenatuora appeared before the court for judgment and

4  sentencing.  (Doc. No. 25.)  At that time he stated that he had received a copy of the presentence

5  report (PSR) and had an opportunity to discuss it with his then current counsel, Deputy Federal

6  Defender Matthew Bockmon.  (Answer, Ex. 4 (Doc. No. 119-2) at 2.)  At the sentencing hearing,

7  in opposing the imposition of a restitution order, Deputy Federal Defender Bockmon argued to

8  the court that, "my client will simply be deported . . . ."  (Id. at 7.)  The prosecutor likewise stated

9  that Mr. Infenatuora would be deported.  (Id. at 6.)  The assigned District Judge sentenced Mr.

10  Ifenatuora to the term of imprisonment noted above and added that

11              [p]ursuant to federal law, upon completion of the term of
               imprisonment, it is ordered that the defendant be surrendered to a
12              duly authorized immigration official for deportation, in accordance
               with the established procedures provided by the Immigration and
13              Naturalization Act.

14              If ordered deported during the term of supervised release, the
               defendant shall remain outside the United States and shall not re-
15              enter the United States without the consent of the attorney general
               of the United States.

16

17  (Id. at 9.)

18          III.   Movant's Lengthy Post-Conviction History In Immigration Courts

19              On September 24, 1998, after Mr. Ifenatuora was released from the custody of the

20  Bureau of Prisons, he was served with notice to appear at a removal proceeding pursuant to

21  section 240 of the Immigration and Nationality Act.  (Answer, Ex. 6 (Doc. No. 119-3) at 2-3.)

22  He was charged as subject to removal because he had been (1) convicted of two crimes involving

23  moral turpitude not arising out of a single scheme and (2) convicted of an aggravated felony.  (Id.

24  at 2.)  The removal hearing was held on June 28, 1999.  The immigration judge (IJ) found Mr.

25  Ifenatuora removable.  (Answer, Ex. 7 (Doc. No. 119-3) at 6-7.)  Movant's immigration counsel

26  at that time argued for deferral of the order of removal under the Convention against Torture Act.

6

(Id. at 7.)  The IJ recited the evidence offered in support of deferring the order of removal issued

to Mr. Ifenatuora, as follows:

> The basis for respondent's claim, in my opinion, rests upon the fact
> that he's a member of a particular social group – the Ogoni tribe in
> the River delta region of Nigeria – and also that the respondent
> would suffer for his political opinion which is [sic] been adverse to
> the long existing government of Nigeria.[7]  Respondent testified to
> the fact that he was a member of the Movement of Suffering Ogoni
> (MOSOP).  In that regard the respondent and his family over the
> years had sought a reform in the area.  The respondent comes from
> the oil producing area and among the other activities of MOSOP,
> they appear to be greens or environmentalists.  Inasmuch as the oil
> fields are owned by the government, the economic incentive for
> persecution is clearly apparent to this Court.
>
> It was the respondent's testimony that his father, mother, and a
> brother have been hanged by the government.  The respondent, in
> fact, returned for his mother's trial in 1987 and 1998 and, in fact
> was jailed for a period of two-three weeks.[8]  The mother was never
> tried; however, she was executed.
>
> The respondent's brother went to South Africa and obtained
> political asylum.  Respondent's brother returned to Nigeria as
> lately as December 1998 where he was shot by person or persons
> unknown at the International Airport in Lagos.
>
> It was respondent's testimony that when he returned for his uncle's
> funeral in 1995 that he was set upon at the burial site by persons
> presumably adverse to the respondent and he received two knife
> wounds in the back.  The Court personally examined the scars and
> the scars appear to be four and a half to five inches in one case and
> one and half inches in the other case.  It was represent's [sic]
> testimony that he somehow fled Nigeria, escaped to the Cameroons
> where he received medical treatment to and including some 30
> stitches which in my opinion appears to be a conservative estimate.

(Id. at 7-9.)  At that time the immigration judge concluded that Mr. Ifenatuora's case against

removal was "one of the clearest cases for relief the Court has seen in some time" and found that

"it would be beyond unconscionable" to order him returned to Nigeria.  (Id. at 9.)  Mr.

Ifenatuora's application for deferral was granted.  (Id.)  The Board of Immigration Appeals

---

[7]  Mr. Ifenatuora appeared as "respondent" at the removal hearing.

[8]  The immigration judge may have meant 1988, since movant was presumably
incarcerated in 1998.

1  ("Board") affirmed the decision on December 10, 2002.  (Answer, Ex. 8 (Doc. No. 119-3) at 13.)

2  On January 24, 2003, the Department of Homeland Security (DHS) filed a motion

3  to terminate the deferral of removal previously granted to Mr. Ifenatuora.  (Id.)  On January 31,

4  2003, Mr. Ifenatuora's immigration counsel, John Crow, requested that the termination hearing

5  be continued because counsel did not know movant's address and could not notify him of the

6  hearing.  (Id.)  On February 5, 2003, movant's immigration counsel provided an address in New

7  York, New York, requested a change of venue and moved to withdraw as counsel of record for

8  movant.  (Id.)  On February 20, 2003, the request to change venue and counsel's motion to

9  withdraw were granted.  (Id.)  Then, on March 19, 2003, Mr. Ifenatuora, presumably acting

10 through new counsel, requested a change of venue from New York to Sacramento, California,

11 where he was then residing.  (Id. at 14.)  Movant's change of venue motion was never

12 adjudicated, and on March 30, 2003, an IJ found Mr. Ifenatuora removable at a hearing held in

13 absentia and ordered him removed to Nigeria.  (Id.)

14 Mr. Ifenatuora appealed the March 30, 2003 decision finding him removable.

15 (Id.)  On June 29, 2004, the Board returned the record of the proceedings to the IJ for preparation

16 of a separate oral or written decision.  (Id.)  In response, the IJ held removal hearings on

17 September 9, 2004, and September 30, 2004, but Mr. Ifenatuora failed to appear at either hearing.

18 (Id.)  On September 30, 2004 the IJ again ordered Mr. Ifenatuora removed in absentia.  (Id.)

19 Mr. Ifenatuora also appealed the September 30, 2004 removal order to the Board.

20 (Id.)  On May 1, 2006, the Board held that "[g]iven the exceptional circumstances presented," the

21 record was to be returned to the Immigration Court so that the parties could be afforded a hearing

22 on DHS's motion to terminate Mr. Ifenatuora's grant of deferral of removal.  (Id.)

23 On July 19, 2006, an immigration judge once again ordered Mr. Ifenatuora's

24 removal in absentia.  (Answer, Ex. 9 (Doc. No. 119-3) at 17.)  On July 3, 2007, the Board

25 acknowledged that movant had appealed the July 19, 2006, removal order, but noted that the

26 proper method for challenging the order was to file a motion to reopen with the IJ, not an appeal

8

1    with the Board.  (Answer, Ex. 10 (Doc. No. 119-3) at 20.)  The Board again ordered the record

2    returned to the immigration court.  (Id.)

3            Sometime in 2009, Mr. Ifenatuora was taken into custody by DHS and detained at

4    the Stewart Detention Center in Lumpkin, Georgia.  (Answer (Doc. No. 119) at 12; Traverse

5    (Doc. No. 127) at 14.)  On May 2, 2011, the Board granted his motion to reopen his immigration

6    case.  (Movant's Post-hearing Brief (Doc. No. 155), Ex. B.)

7            A new immigration court decision ordering Mr. Ifenatuora's removal was issued

8    February 14, 2013.  Mr. Ifenatuorah also appealed that decision on March 15, 2013, and as of the

9    date of these finding and recommendation, that appeal remains pending.[9]

10       III.  Movant's Claim In These Proceedings

11           As noted above, movant Ifenatuora alleges herein that he received ineffective

12    assistance from his criminal trial counsel.  (Writ (Doc. No. 103) at 4-5.)  He alleges that his

13    attorney, Assistant Federal Defender Matthew Bockmon, failed to advise him about the

14    intervening change in immigration law between the time he pled guilty in this court on

15    September 6, 1996, and the time of his judgment and sentencing on January 17, 1997, and

16    therefore failed to advise him that his guilty plea would result in an aggravated felony conviction

17    and probable (if not certain) deportation.  (Traverse (Doc. No. 127) at 1-2; Ex. C (Doc. No. 127-

18    3) at 4.)  In a sworn declaration Mr. Ifenatuora has further alleged that during discussions with

19    his counsel,

20         Attorney Bockmon told me the government only deports
         individuals convicted of drug offenses and fraud in a single scheme

21         over five years.  He did not tell me I would certainly deported.  He
         specifically told me not to worry about the court colloquy because

22         the court reads everything about immigration for foreign born
         defendants, but that as a lawful permanent resident for 14 years I

23         should not worry.  Attorney Bockmon also told me if I helped the

24

25         [9]  The court obtained the latest information regarding the status of Mr. Ifenantuora's
    immigration case by using the BIA's case status phone number and entering the case number

26    listed on the order granting his motion to reopen.

1    government, the government would help me <u>if</u> deportation were
2    initiated.  He did not tell me I would be deported.

3    (Traverse Ex. C (Doc. No. 127-3).)  For his part, Assistant Federal Defender Bockmon has

4    submitted declarations swearing that "[b]ased on my practice in 1996, my review of the case file,

5    as well as my review of existing transcripts in connection with sentencing, I am certain I advised

6    Mr. Ifenatuora that he likely was subject to deportation as a result of his conviction in this case."

7    (Answer, Ex. 1, ¶ 15.)  However, Attorney Bockmon has conceded in another declaration filed

8    with the court, that he has "no recollection of discussing the change in the immigration laws with

9    Mr. Infenatuora.  Nothing in the file indicates I discussed the change in the immigration laws

10   with Mr. Ifenatuora."  (Traverse, Ex. D (Doc. No. 127-4), ¶ 2.)

11          This court reviewed Mr. Ifenatuora's motion for writ of error coram nobis and in

12   order to assist in resolving his claim, on August 3, 2011, ordered an evidentiary hearing.

13   Thereafter, by stipulation the parties twice requested that the evidentiary hearing be continued

14   and it was eventually held on April 23, 25 and 30, 2012, at which time the court heard testimony

15   from Assistant Federal Defender Matthew Bockmon and then from movant Ifenatuora.[10]

16   Thereafter, the parties requested leave to submit post-hearing further briefing and the matter was

17   submitted for decision following the filing of those supplemental briefs.

18          A.   Legal standards

19          The writ of error coram nobis is an extraordinary remedy that allows a movant to

20   attack an unconstitutional or unlawful conviction after the movant has served his sentence and is

21   no longer in custody.  <u>United States v. Morgan</u>, 346 U.S. 502, 511 (1954); <u>Estate of McKinney v.</u>

22   <u>United States</u>, 71 F.3d 779, 781 (9th Cir. 1995).  "The writ provides a remedy for those suffering

23

_____

24          [10]  At the evidentiary hearing, the parties and the court relied on a lengthy index of
     documents, numbered 1 through 40.  The court accepted several of those documents into
25   evidence upon motion of the parties and refers to them herein simply as "Ex. ___."  The exhibits
     accepted into evidence are listed at Docket No. 149.  The three-day hearing transcript appears at
26   Docket Nos. 147, 148 and 150.

1    from the 'lingering collateral consequences of an unconstitutional or unlawful conviction based

2    on errors of fact' and 'egregious legal errors.'"  United States v. Walgren, 885 F.2d 1417, 1420

3    (9th Cir. 1989) (quoting Yasui v. United States, 772 F.2d 1496, 1498-99 & n.2 (9th Cir. 1985)).

4    The writ permits a court to vacate its judgment when an error has occurred that is of such

5    fundamental character that the proceeding itself is rendered invalid.  McKinney, 71 F.3d at 781.

6    The writ should be granted "only under circumstances compelling such action to achieve justice."

7    Morgan, 346 U.S. at 511.

8            To qualify for coram nobis relief, a movant must establish that:  (1) a more usual

9    remedy is not available; (2) valid reasons exist for not attacking the conviction earlier; (3)

10   adverse consequences exist from the conviction to satisfy the case and controversy requirement

11   of Article III; and (4) the error suffered is of the most fundamental character.  United States v.

12   Kwan, 407 F.3d 1005, 1011 (9th Cir. 2005), abrogated in part on other grounds by Padilla v.

13   Kentucky, 559 U.S. 356, 130 S. Ct. 1473 (2010).

14           A claim of ineffective assistance of counsel may, if proved, suffice as the "error of

15   the most fundamental character" needed to obtain a writ of error coram nobis.  See, e.g., Kwan,

16   407 F.3d at 1014; United States v. Mett, 65 F.3d 1531, 1534 (9th Cir. 1995).  The Supreme Court

17   set forth the test for demonstrating ineffective assistance of counsel in Strickland v. Washington,

18   466 U.S. 668 (1984).  First,[11] a claimant must show that, considering all the circumstances, his

19   criminal defense counsel's performance fell below an objective standard of reasonableness.

20   Strickland, 466 U.S. at 687-88.  This element requires the claimant to identify the acts or

21   omissions that fell below that standard; then the court must determine whether, in light of all the

22

---

23          [11]  The usual analysis in assessing a Strickland claim proceeds by inquiring into the
     reasonableness of counsel's performance first and the prejudice suffered by the claimant second.
24   However, the reviewing court "need not determine whether counsel's performance was deficient
     before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . .
25   . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient
     prejudice . . . that course should be followed."  Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir.
26   2002) (quoting Strickland, 466 U.S. at 697).

1    circumstances, those acts or omissions were outside the wide range of professionally competent

2    assistance.  Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).  Second, he must establish

3    that he was prejudiced by counsel's deficient performance.  Strickland, 466 U.S. at 693-94.

4    Prejudice exists if "there is a reasonable probability that, but for counsel's unprofessional errors,

5    the result of the proceeding would have been different."  Id. at 694.  A reasonable probability is

6    "a probability sufficient to undermine confidence in the outcome."  Id.  See also Williams, 529

7    U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).

8               In assessing an ineffective assistance of counsel claim "[t]here is a strong

9    presumption that counsel's performance falls within the 'wide range of professional assistance.'"

10   Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (quoting Strickland, 466 U.S. at 689).  There

11   is, in addition, a strong presumption that counsel "exercised acceptable professional judgment in

12   all significant decisions [he] made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing

13   Strickland, 466 U.S. at 689).

14              Mr. Ifenatuora filed his first motion for writ of error coram nobis less than one

15   month after the U.S. Supreme Court handed down its decision in Padilla v. Kentucky, cited

16   above.  There, the Supreme Court held for the first time that a lawyer's "advice regarding

17   deportation is not categorically removed from the ambit of the Sixth Amendment's right to

18   counsel."  Padilla, 559 U.S. at ___, 130 S. Ct. at 1482.  The Court further held that "[i]t is

19   quintessentially the duty of counsel to provide her client with available advice about an issue like

20   deportation, and the failure to do so 'clearly satisfies the first prong of the Strickland analysis.'"

21   130 S. Ct. at 1484 (citation omitted).  Thus, short of some bar to the application of its holding

22   here, Padilla stands as legal authority that would support movant Ifenatuora's claim for relief,

23   provided his allegations about Assistant Federal Defender Bockmon's performance were found

24   to be true.

25   /////

26   /////

12

B.  <u>Analysis</u>

The government concedes that movant Infenatuora has satisfied the first and third required elements to qualify for coram nobis relief.  (Answer (Doc. No. 119) at 14.)  Movant is not a prisoner in custody under the sentence of a court and therefore a more usual remedy is not available to him.  Moreover, the possibility of deportation satisfies the case and controversy requirement of Article III.  <u>See</u> <u>Kwan</u>, 407 F.3d at 1014 ("It is undisputed that the possibility of deportation is an 'adverse consequence' of Kwan's conviction sufficient to satisfy Article III's case or controversy requirement."); <u>Park v. California</u>, 202 F.3d 1146, 1148 (9th Cir. 2000) ("Because he faces deportation, Park suffers actual consequences from his conviction.") However, in this case the Government disputes the satisfaction of the second and fourth elements - that there was a valid reason for movant's failure to attack his conviction earlier and that he suffered an error of the most fundamental character.  The court addresses the latter argument first.

1.  <u>Whether the error suffered is of the most fundamental character</u>

The government argues that Mr. Ifenatuorah has not suffered an error of the most fundamental character because the ruling in <u>Padilla</u> is not retroactive.  It argues further that even if the holding in <u>Padilla</u> were to apply retroactively, Mr. Ifenatuora has failed to establish that he received ineffective assistance of counsel in his criminal case.  (Answer (Doc. No. 119) at 21-38.)

a.  <u>Retroactivity of Padilla</u>

The parties have extensively briefed whether the holding in <u>Padilla</u> should be applied retroactively to Mr. Ifenatuora's claim of ineffective assistance of counsel or whether his claim is barred by <u>Teague v. Lane</u>, 489 U.S. 288 (1989), which forbids retroactive application of new constitutional rules.  Whether or not a rule is "new" for <u>Teague's</u> purposes is not always clear-cut, but before this court reached its conclusion on the question of <u>Teague's</u> application to <u>Padilla</u>, the Supreme Court resolved that question.  In this regard, the Court recently held that it

1   had "announced a new rule in Padilla.  Under Teague, defendants whose convictions became

2   final prior to Padilla therefore cannot benefit from its holding."  Chaidez v. United States,

3   ___U.S. ___, ___, 133 S. Ct. 1103, 1113 (2013).

4            Anticipating the possibility that the holding in Padilla might be found not to apply

5   retroactively, Mr. Ifenatuora's pre-Chaidez briefing draws a distinction between the ruling of the

6   Supreme Court in Padilla and the Ninth Circuit's decision in United States v. Kwan, a case cited

7   above.  (See Traverse at 4-11 (Doc. No. 127)).  In this regard, counsel on behalf of movant

8   Ifenatuora argues that even if the holding in Padilla does not retroactively impose on a criminal

9   counsel the affirmative duty to apprise his client of the immigration consequences of a

10  conviction, Kwan still controls in a case such as this one, where the movant alleges that his

11  attorney volunteered advice about the adverse effects of a guilty plea on one's immigration status

12  yet misadvised the client to his detriment.  At least to some extent, the Ninth Circuit's opinion in

13  Kwan provides support for this argument.  In Kwan the Ninth Circuit began its reasoning by

14  reaffirming that "an attorney's failure to advise a client of the immigration consequences of a

15  conviction, without more, does not constitute ineffective assistance of counsel," but then found

16  that "effectively misle[ading] his client about the immigration consequences of a conviction" is

17  "more" than sufficient to invoke Strickland.[12]  Kwan, 407 F.3d at 1015.

18

19       [12]  The court notes that Kwan bears an uncanny, indeed startling, resemblance to this case
      based on the facts as alleged by movant Ifenatuora.  Kwok Chee Kwan was a lawful permanent
20    resident who pled guilty on July 9, 1996, to two counts of bank fraud in the U.S. District Court
      for the Central District of California.  See Kwan, 407 F.3d at 1008.  His trial counsel had assured
21    him that, while it was technically possible that he would be deported, "'it was not a serious
      possibility.'"  Id.  According to the Ninth Circuit, "[c]ounsel also explained to Kwan that, at his
22    plea colloquy, the judge would tell him that he might suffer immigration consequences, but
      reassured him that there was no serious possibility that his conviction would cause him to be
23    deported."  Id.  Then, on September 30, 1996, IIRIRA was enacted.  On December 2, 1996,
      Kwan was sentenced to one year and one day in prison and ordered to pay restitution in the
24    amount of $10,000.  Id. at 1009.  On May 1, 1997, the INS issued Kwan a Notice to Appear that
      stated that he was subject to deportation.  Id.  After several years of wrangling with the INS,
25    Kwan filed a petition for writ of error coram nobis, alleging that his trial counsel committed a
      Strickland violation by misleading him regarding the immigration consequences of his guilty plea
26    after the enactment of IIRIRA.

14

1    Here, movant Ifenatuora thus distinguishes between a <u>Strickland</u> violation that

2    results from counsel's silence about the probability of deportation (conduct first labeled

3    constitutionally deficient in <u>Padilla</u>) versus a violation that accrued when counsel undertook to

4    advise her client about immigration consequences but gave him bad information (conduct held to

5    be unreasonable and therefore constitutionally deficient at least since the Ninth Circuit's decision

6    in <u>Kwan</u>).  Mr. Ifenatuora asserts, in other words, that a classic omission-versus-commission

7    distinction underpins the Ninth Circuit's holding in <u>Kwan</u> and works in his favor.  He maintains

8    that here, his Federal Defender rendered a constitutionally deficient performance under

9    <u>Strickland</u> by giving him unreasonably bad advice about the immigration consequences of his

10   guilty plea.  In addition, he contends that even in the wake of the decision in <u>Chaidez</u>, the holding

11   in <u>Kwan</u> survives to support his claim for relief.

12        The flaw with Mr. Ifenatuora's argument is that the Supreme Court in <u>Padilla</u>

13   rejected its core distinction, saying "there is no relevant difference 'between an act of

14   commission and an act of omission' in this context."  <u>Padilla</u>, 130 S. Ct at 1484 (citations

15   omitted) (emphasis added).  That, plus the Court's clear holding in <u>Chaidez</u>, would appear, at

16   first glance, to be the last word on movant Ifenatuora's reliance on <u>Kwan</u>.  Still, this court pauses

17   at the apparent incongruity in not applying a Ninth Circuit decision that recognized movant

18   Ifenatuora's claim several years before the Supreme Court in <u>Padilla</u> validated it and even longer

19   before the Supreme Court in <u>Chaidez</u> concluded that <u>Padilla</u> is <u>Teague</u>-barred.  That is, the Court

20   in <u>Padilla</u> may have rejected the omission-commission divide that <u>Kwan</u> drew "in this context,"

21   but it also vindicated <u>Kwan's</u> ultimate holding that misadvising a defendant about the

22   immigration consequences of one's plea was, indeed, a <u>Strickland</u> violation.  Moreover, the

23   Supreme Court in <u>Chaidez</u> did not say or indicate in any way that <u>Padilla</u> abrogated, overruled or

24   otherwise nullified the holding in <u>Kwan</u>.  To the contrary, the Supreme Court in <u>Chaidez</u>

25   mentions <u>Kwan</u> as one of a minority of decisions that had applied <u>Strickland</u> to a lawyer's advice

26   on the immigration consequences of a conviction before <u>Padilla</u> and said that those cases

15

"recognized a separate rule for material misrepresentations . . . .  That limited rule does not apply in Chaidez's case."  Chaidez, 133 S. Ct. at 1112 (emphasis added) (citation omitted).  By the Supreme Court's reasoning in Chaidez then, it is arguable that Kwan's "separate rule" survives Chaidez precisely because it is separate and not subsumed by Padilla.

In the undersigned's view, it remains an open question whether a petitioner or movant whose conviction was final in the Ninth Circuit before the decision was announced in Padilla can still rely on the holding in Kwan to bring a claim of ineffective assistance of counsel based on an allegation that his lawyer affirmatively misadvised him about the immigration consequences of a plea and resulting criminal conviction.  While it may be an open question, for purposes of this case it is also an academic one on which the court should refrain from ruling.  That is because regardless of whether movant Ifenatuora's claim is Teague-barred under the Supreme Court's holding in Chaidez or remains viable under the Ninth Circuit's holding in Kwan, it is wholly without merit.[13]  Below, the undersigned explains why this is the case.

b. Whether counsel was ineffective

The burden of proving that counsel's performance fell below an objectively reasonable standard of effectiveness is on the party making the claim.  See Cheney v. Washington, 614 F.3d 987, 995 (9th Cir.2010).  It requires evidence or testimony that overcomes the strong presumption that counsel performed adequately.  See id; see also Strickland, 466 U.S. at 689.  The primary contest of evidence in this case with respect to movant's ineffective assistance of counsel claim is one of credibility, and on the movant's side the undersigned finds

---

[13]  "A fundamental and long-standing principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."  Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 445 (1988).  The viability of the holding in Kwan after the decision in Chaidez is probably better understood as an equitable and prudential question as opposed to a constitutional one.  See Danforth v. Minnesota, 552 U.S. 264, 278 (2008) (finding Teague "plainly grounded in [the Supreme Court's] authority . . . [to] adjust[] the scope of federal habeas relief in accordance with equitable and prudential considerations").  However, the exercise of judicial restraint to avoid an unnecessary ruling of first impression is just as appropriate in cases where, as here, it remains a clear and available option.

there is a total lack of it.  With no evidence other than his word that his attorney was deficient,
there is insufficient evidence before this court that Deputy Federal Defender Bockmon's conduct
or performance was unreasonable in any way.[14]

As noted at the outset above, on April 17, 1996, the movant's attorney at the time,
then Federal Defender Arthur Ruthenbeck, sent the government a letter requesting a favorable
word on the movant's behalf "[i]n the event deportation proceedings are instituted against Mr.
Ifenatuorah." (Ex. 15, ¶ 5.)  Mr. Ifenatuora was copied on that letter, and at the evidentiary
hearing he testified that he "probably" received a copy.  (April 23, 2012 Tr. at130.)  Immediately
after he acknowledged having "probably" received the letter, though, Ifenatuora tried to have it
another way with respect to his understanding of the potential immigration consequences of his
case:

> Q.   Do you recall having a conversation with Mr. Ruthenbeck in
> which he told you that it was possible deportation proceedings
> would be commenced?
>
> A.   That's not correct.
>
> Q.   And do you recall a conversation with Mr. Ruthenbeck
> indicating that if deportation proceedings were commenced, that
> perhaps he could convince the prosecution to write a favorable
> letter to the [Immigration and Naturalization Service]?
>
> A.   I remember that.
>
> Q.   Okay.  So Mr. Ruthenbeck did tell you that it was possible
> deportation proceedings would commence, didn't he?

---

[14]   Movant's counsel devotes the first section of her post-hearing brief on a perceived "misunderstanding" the court initially harbored about Ifenatuora's immigration case, his immigration attorney's reasons for withdrawing from his case, and allegations by the Board that Ifenatuora had submitted fraudulent documents in pleading for asylum.  (Movant's Brief (Doc. No. 155) at 3-6.)  Counsel's argument to clarify the record in that regard is duly noted, and the court states once again here that neither attorney Crow's withdrawal from immigration case nor the Board's allegation of fraud was weighed by the undersigned in rendering these findings and recommendations.  As stated at the evidentiary hearing, the court suggests no impression about the merit of Ifenatuora's ongoing immigration case before the Board to avoid removal, nor does it make any finding herein "on his [Ifenatuora's] credibility with respect to assertions made in connection with those proceedings." (April 25, 2012 Tr. at 73.)

1        A.    That's incorrect.

2   (Id. at 130-31.)

3            Mr. Ifenatuora's ineffective assistance of counsel claim focuses on the advice

4   attorney Bockmon, who took over his case from attorney Ruthenbeck, gave him.  However,

5   movant's own testimony about attorney Ruthenbeck's advice preludes an account of legal

6   representation and personal knowledge that is neither plausible nor coherent.  Ifentauora's

7   position is not that attorney Bockmon never discussed the possibility of deportation with him;

8   rather, his position is that Bockmon affirmatively misled him about the nature of the proceedings

9   after he pled guilty and the sincerity of the prosecutor and the court about the effect his

10  conviction would have on the government's effort to deport him.  Referring at the evidentiary

11  hearing to the section of the presentence report that, once the recommendation was adopted by

12  the court, clearly ordered his removal from the United States, Mr. Ifenatuora's counsel in these

13  proceedings asked him:

14          Q:    Did you review that with Mr. Bockmon?

15          A:    That's correct.

16          Q.    And what, if anything, did you discuss with Mr. Bockmon?

17          A.    . . . [W]hen he first picked up the case, I let him know what
                  my situation is in Nigeria so when this thing came up it was
18                shocking to me and he's like well you don't have to worry about it.
                  This is for people with drug cases.  And it's more like a stand-up
19                procedure.  I remember he called it something like colloquial that
                  has to be for all foreign defendants in their file.  And he said again
20                – you're going to hear this again during the sentencing hearing, but
                  it's just colloquial.
21
            Q.    Did that concern you a little bit?
22
            A.    Not really.
23
            Q.    Okay let's go back to prior to your plea.  Prior to the time that
24                you pled guilty –

25          A.    Uh-huh.

26  /////

18

Q.    – did you have a discussion with Mr. Bockmon about immigration consequences?

A.    That's correct.

Q.    And what did he tell you?

A.    He say you don't have a drug case.  And you should not worry about it.  Most people with white collar crime have to have over five years on a particular sentence to be worried about deportation.

Q.    And did Mr. Bockmon ever tell you what a crime of moral turpitude was?

A.    No, ma'am.

(Tr. 55-56, April 23, 2012.)[15]  Ifenatuora testified that not only did Bockmon not tell him the meaning of "crime of moral turpitude" in connection with his immigration status, he never knew what that term or the term "aggravated felony" meant until 2009, after he had been taken into custody by immigration enforcement officials and placed in the detention center in Georgia.  (Id. at 44-45.)  There is ample evidence to show that Mr. Ifenatuora was lying when he gave this testimony at the evidentiary hearing in this matter.

The evidence shows that the movant was made aware of the immigration consequences of a fraud conviction and was familiar with the term "crime of moral turpitude" in the immigration context well before he was indicted in this court in 1996.  From 1987 to 1991 Mr. Ifenatuora was convicted on four fraud-related charges in three different jurisdictions:  theft by check in Texas in 1987; two charges of false pretenses in North Carolina in 1989 and 1990; and mail fraud in Maryland in 1991.  (Presentence Investigation Report, Government's Ex. 17, ¶¶ 30-40.)  Two of those charges (the ones from Texas and Maryland) were cited in an Order to Show Cause issued by the Immigration and Naturalization Service to the movant in 1993.  That

---

[15] By "colloquial" Ifenatuora presumably meant that the lawyers' and judge's references to deportation would only be part of the colloquy at the change of plea and sentencing.  It was apparent by the end of the evidentiary hearing before this court that "colloquial" for Mr. Ifenatuora meant an empty recitation of legal words that carried no legal effect.

order stated that "on the basis of the foregoing allegations, it is charged that you are subject to deportation [for] hav[ing] been convicted of two crimes of moral turpitude not arising out of the same scheme of criminal misconduct." (Ex. 13 at 3.)  The order required Ifenatuora's presence at a hearing before an immigration judge "to show cause why you should not be deported from [the] United States on the charge(s) set forth above."  (Id.)  Mr. Ifenatuora acknowledged his receipt of the order in writing, and the serving officer certified that she had read the contents to him in English. (Id. at 5.)  Years later, in this case, counsel for the government showed Mr. Ifenatuora a copy of the show cause order at the evidentiary hearing, yet, even with the document in front of him, and admitting that he has known how to read English since he was a child, he contended that he never understood the contents of the show cause order.  (April 23, 2012 Tr. at 123-27.)

Throughout the evidentiary hearing, Mr. Infenatuora nonetheless stuck to his account that the first time he ever understood the immigration consequences of a crime of moral turpitude or of an aggravated felony was in 2009.  (See, e.g., April 25, 2012 Tr. at 49-50.)  That account became even less believable after counsel for the government presented Mr. Infenatuora with a copy of the transcript from a removal hearing that Infenatuora had attended on November 5, 1998.  (See Ex. 24.3.)  There, the immigration judge specifically informed Mr. Ifenatuora that he was subject to deportation for crimes of moral turpitude and aggravated felonies to which he pled guilty in federal court in Maryland and in this court.  (Id. at 3.)  Ifenatuora stated at that deportation hearing that he understood the charges against him and the purpose of the hearing. (Id. at 3-4.)  Mr. Infenatuora went on to concede to the immigration judge that he had committed crimes of moral turpitude, but he contested the amount of money involved in those crimes – thus indicating that he well understood at that time the difference between a crime of moral turpitude, which had no dollar requirement, and an aggravated felony, which required a fraud involving at least $10,000, for purposes of the deportation statutes.  (Id. at 6-7.)  In other words, in 1998 Mr. Infenatuora affirmatively argued the legal distinction between crimes of moral turpitude and aggravated felonies on his own behalf, on the record, to an immigration judge, in a deportation

20

1  hearing.  Yet at the evidentiary hearing before this court, he maintained, even with the transcript

2  of that 1998 deportation proceeding in front of him, that he did not know until 2009 what the

3  immigration ramifications of crimes of moral turpitude and aggravated felonies were.  (Tr. 66-

4  68.)  When the undersigned questioned Mr. Infenatuora directly on this glaring inconsistency

5  and made clear to him that the problem was that his explanation "just doesn't seem to fly at all,"

6  Mr. Infenatuora did not even try to provide clarification.  (Id. at 67-68.)  He answered merely,

7  "Well it's my understanding of the word" (id. at 68) – telling the court, essentially, that his

8  "understanding" of the effect of his crimes on his immigration status was going to be whatever

9  he needed it to be to support his claim for error coram nobis relief, despite all clear and contrary

10  indications from the record.

11            Sometimes that posture meant Mr. Infenatuora testifying that his memory of his

12  legal process in this court was murky because in 1996 and 1997 he was too distracted by outside

13  events to let the details of his criminal case interest him.  Thus, he attempted to explain that he

14  was not particularly engaged in his plea bargaining negotiations because by that time he was

15  preoccupied with news of his mother's detention by a hostile government in Nigeria.  (April 25,

16  2012 Tr. at 20.)  He unpersuasively testified, referring to the plea agreement in this case that he

17  signed on September 6, 1996:

18            I can't recall reading all this stuff, especially after Mr. Bockmon
              took over my case, and he's not filing all the motions that I wanted
19            him to file.  I filed a motion to get him off my case.  He still stayed
              on my case.  So at that point in time, I'm not interested in what's
20            going on in this case.

21  (Id.)  Mr. Infenatuora also attempted to use general apathy about his case and ignorance as an

22  excuse.  Still testifying about his plea agreement, he claimed:

23            I pretty much did not read all that.  All I know is I signed the
              documents, you know.  Most of the people, when these documents
24            are brought, which include myself, they just sign the documents
              and give it back to their attorney.  We don't pay particular attention
25            to what is written on it[.]

26  (Id. at 30.)  Flailing about for additional conceivable explanations, Mr. Infenatuora testified that

21

his history of excessive drug use may also have hindered his ability to pay close attention to his criminal case.  (Id. at 37-40.)  Though not by itself dispositive, that self-diagnosis does add any credibility to his contention now that he remembers exactly what his attorney Bockmon told him in 1996 (and what attorney Bockmon allegedly left out) regarding the probability of deportation and that he never understood deportation was a likely, if not certain, outcome until 2009.  (See id. at 48-49.)

Perhaps the clearest indication that at the time of his sentencing Mr. Ifenatuora in fact knew that his deportation was imminent is the statement in the pre-sentence report that after his term of incarceration he would "be immediately surrendered to a duly authorized immigration official for deportation[.]" (Ex. 17 at 18.)  The presentence report is dated December 11, 1996 – approximately two-and-a-half months after IIRIRA became effective.  (Ex. 17 at 20.)  Moreover, at his sentencing hearing on January 17, 1997, Mr. Ifenatuora affirmed to the district judge on the record that he had "received and read a copy and had an opportunity to discuss" his presentence report "in detail."  (Ex. 18 at 2.)  At the 2012 evidentiary hearing before the undersigned, however, he testified regarding his presentence report - "I probably did not review it."  (April 25, 2012 Tr. at 31-32.)  Instead, at that time he repeated his position that his attorney had advised him that regardless of what the presentence report contained or what the prosecutor or the sentencing judge might say in open court, "only drug cases, and people with a single sentence of over five years are deported."  (Id. at 34.)  Mr. Ifenatuora simply relied on his allegation that Assistant Federal Defender Bockmon told him that references to deportation at sentencing hearing were only "colloquial" – on his account, a scripted scene that had no real legal effect. (Id.)

Throughout the evidentiary hearing before the undersigned, it did not matter what or how much documentary evidence Ifenatuora had in front of him, his position remained that he believed that none of the documents he received or statements about deportation he heard from judges, prosecutors or his own lawyer had any meaning, or at least no meaning he could

22

understand.  He maintained that his attorney abetted this belief by telling him that references to

deportation were merely part of a colloquy in a "stand-up procedure."  Throughout, Mr.

Ifenatuora stuck to his unbelievable story that he never knew what a crime of moral turpitude was

until 2009, even though his record with the immigration authorities is replete with the federal

government's various efforts to deport him for crimes of moral turpitude since 1993.

Nonetheless,  Ifenatuora held fast to this pattern of implausible ignorance to the end, until his

case for relief devolved into something devoid of any truth whatsoever.  The evidence, and his

own testimony in response to that evidence, added up to a complete and total impeachment of his

credibility in the eyes of this court.[16]

IV.   Conclusion

Even though Mr. Ifenatuora's claim is not Teague-barred, he has not produced

evidence sufficient for the granting of relief in response to his pending motion for writ of error

coram nobis.  The fatal deficiency in his case is his complete and total lack of credibility as to

what he understood could be the ramifications of a guilty plea on his immigration status, and of

when he understood those possible consequences.  The court simply does not believe movant

Ifenatuora's key allegation that his appointed attorney, Assistant Federal Defender Matthew

Bockmon, misled him with respect to the effects of a guilty plea on his immigration status before

---

[16]  The court notes that Mr. Ifenatuora's estrangement from the truth was not limited to issues connected directly to his motion for writ of error coram nobis.  In 1995, for example, he wrote on an application for naturalization that he had never been arrested or penalized "for breaking or violating any laws or ordinance excluding traffic violations."  (Ex. 36, ¶ 15.)  When he submitted that answer under penalty of perjury, he had in fact already accrued the four convictions on fraud-related charges discussed above, plus an arrest and eighty-eight days in jail for possession of marijuana in 1989.  (See Ex. 17, p. 9.)  Unsatisfied with mere misrepresenting the truth by checking the "no" box on the application, he went so far as to interject in handwriting, in a space not intended for independent comment (much less outright lies), "I have never been arrested for any reason."  (Ex. 36, ¶ 15.)  In fact, Mr. Ifenatuora had by that time been arrested for many reasons and on several occasions.  When confronted with this blatant falsehood at the evidentiary hearing before this court, Ifenatuora again pled an ignorance that no rational fact-finder could possibly believe: "I probably didn't understand the question."  (April 23, 2012 Tr. at 116.)  He used that excuse numerous times during the evidentiary hearing before this court, never believably.

1  or after IIRIRA became effective, nor is there any objective evidence before this court to support

2  that allegation.  To the contrary, there is ample evidence before this court that Mr. Ifenatuora had

3  the information necessary to understand that a conviction on the charges lodged against him in

4  this court would put his status as a legal resident in serious peril.  There was no <u>Strickland</u>

5  violation.  The movant has made no showing of an error of the most fundamental character

6  necessary to warrant a writ of error coram nobis.

7          Having so found, the court need not inquire into the timeliness of the motion.  The

8  motion for writ of error coram nobis should be dismissed with prejudice.

9          THEREFORE, IT IS HEREBY RECOMMENDED that the motion for writ of

10  error coram nobis (Doc. No. 103) be dismissed with prejudice.

11          These findings and recommendations are submitted to the United States District

12  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-

13  one days after being served with these findings and recommendations, any party may file written

14  objections with the court and serve a copy on all parties.  Such a document should be captioned

15  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

16  shall be served and filed within twenty-one days after service of the objections.  The parties are

17  advised that failure to file objections within the specified time may waive the right to appeal the

18  District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

19  DATED: June 26, 2013.

21  _Dale A. Drozd_

22  DALE A. DROZD
   UNITED STATES MAGISTRATE JUDGE

24  hm
   ifen0088.coram.nobis.2.wpd